RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0399P (6th Cir.)
File Name: 00a0399p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DAVID J. PERTUSO, KAREN A.
PERTUSO,
      *Plaintiffs-Appellants*,

    *v.*

FORD MOTOR CREDIT
COMPANY,
      *Defendant-Appellee*.

No. 99-1132

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-70551—Denise Page Hood, District Judge.

Argued: March 10, 2000

Decided and Filed: November 22, 2000

Before: NELSON, BOGGS, and NORRIS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Jamie S. Franklin, MEITES, MULDER, BURGER & MOLLICA, Chicago, Illinois, for Appellants. Carl H. Von Ende, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, for Appellee. **ON BRIEF:** Jamie S. Franklin, Michael M. Mulder, Thomas R. Meites,

1

MEITES, MULDER, BURGER & MOLLICA, Chicago, Illinois, for Appellants.  Thomas G. Parachini, Donald J. Hutchinson, Lindsay L. Bray, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

DAVID A. NELSON, Circuit Judge.  After declaring bankruptcy, the plaintiffs brought the present action against a secured creditor that had solicited a "reaffirmation agreement" from them while the bankruptcy proceedings were pending. The plaintiffs signed the agreement and continued to remit regular monthly payments to the defendant.  The gravamen of the plaintiffs' complaint was that the defendant violated the automatic stay provision codified in 11 U.S.C. § 362, as well as violating 11 U.S.C. § 524, a section of the bankruptcy code that governs the validity of reaffirmation agreements.

The district court dismissed both of these claims, along with related state law claims.  Upon *de novo* review, we conclude that the challenged judgment should be affirmed.

I

The plaintiffs, Rhode Island residents David and Karen Pertuso, purchased a Windstar van on which they obtained financing through the defendant, Ford Motor Credit Company.  On July 30, 1996, the Pertusos filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Rhode Island.  The balance remaining on the van, $18,950, was listed as a secured debt.

When they made their bankruptcy filing, the Pertusos submitted a "statement of intent" pursuant to 11 U.S.C. § 521(2)(A).  This statement informed the court and the creditors that the Pertusos intended to reaffirm their debt to Ford in order to be able to retain possession of the van.

the bankruptcy process." *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir. 1996).

The Pertusos argue that their state law unjust enrichment claim and their claim for an accounting are not inconsistent with the Bankruptcy Code and thus should not be deemed to have been preempted. None of the cases on which they rely, however, involved unjust enrichment claims. Where such claims have been presented, courts have typically held them to be preempted. See, *e.g., Bessette*, 2000 WL 1585090 at *7; *Cox*, 242 B.R. at 450; *Pereira*, 223 B.R. at 31-32; *In re Knox*, 237 B.R. 687, 702 (Bankr. N.D. Ill. 1999); *In re Lenior*, 231 B.R. 662, 675 (Bankr. N.D. Ill. 1999).

As Ford correctly points out, the Pertusos' state law claims presuppose a violation of the Bankruptcy Code. Permitting assertion of a host of state law causes of action to redress wrongs under the Bankruptcy Code would undermine the uniformity the Code endeavors to preserve and would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Bibbo*, 151 F.3d at 562-63. Accordingly, and because Congress has preempted the field, the Pertusos may not assert these claims under state law.

**AFFIRMED.**

Ford then sent the Pertusos a letter proposing a reaffirmation agreement that appears consistent – or at least not inconsistent – with the Pertusos' statement of intent. The first paragraph of the proposed agreement began as follows:

"In consideration of Ford Motor Credit Company's ("Ford Credit") refraining from seeking Bankruptcy Court authorization to retake property from me under the lien of its security agreement, or exercising any other legal right it may presently have against me as provided by law, I hereby reaffirm and agree to pay my obligations to Ford Credit and to make monthly payments commencing 9/16/96 of $398.93 each until the debt has been satisfied, according to the terms of the original contract."

In keeping with 11 U.S.C. § 524(c)(2)(A), the agreement went on to provide that the Pertusos could rescind their reaffirmation at any time prior to discharge or within 60 days after the filing of the agreement with the court, whichever occurred later. Ford reserved the right both to proceed against the Pertusos if they failed to comply with the terms of the agreement and to accelerate the debt if any installment should not be paid when due or within ten days thereafter.

A Ford representative signed the document before it was sent to the Pertusos. On September 6, 1996, the Pertusos and their attorney added their signatures. The agreement was returned to Ford, and no one filed it with the court.

On October 28, 1996, the Pertusos received their discharge in bankruptcy. The record indicates that the Pertusos remained current on their payments to Ford both before and after the discharge.

Becoming persuaded at some point that the reaffirmation agreement was the product of improper debt collection practices on Ford's part, the Pertusos brought a purported class action against Ford on February 9, 1998. The complaint, which was filed in the United States District Court for the Eastern District of Michigan, alleged that Ford

routinely solicited reaffirmation agreements from bankrupt debtors; that it failed to file the agreements in court; and that although the agreements were unenforceable, Ford used them to collect substantial sums from members of the purported class. The complaint alleged violations of 11 U.S.C. §§ 524(a)(2), 524(c), and 362, asserted a state law claim of unjust enrichment, and sought an accounting.

Ford responded by filing a motion to dismiss. The Pertusos then sought leave to file an amended complaint incorporating a copy of the reaffirmation agreement. After hearing argument, and without granting class certification, the district court denied leave to file the amended complaint and dismissed the case. This appeal followed.

## II

### A.   AMENDMENT OF COMPLAINT

As the Pertusos correctly point out, Fed. R. Civ. P. 15(a) gives plaintiffs an absolute right to amend their complaint one time before a "responsive pleading" is served. A Rule 12(b)(6) motion to dismiss does not qualify as a "pleading," see Fed. R. Civ. P. 7, so the Pertusos were entitled to amend their complaint. The district court took the allegations of the amended complaint into account, however, and while the formal denial of leave to amend was an error, the error was harmless if the amended complaint failed to state a claim upon which relief could be granted. For the reasons explained below, we conclude that the complaint did fail to state such a claim.

### B.   PRIVATE RIGHT OF ACTION UNDER § 524

Whether 11 U.S.C. § 524 impliedly creates a private right of action for an asserted violation of the section is a question of first impression in this circuit. The Pertusos argue that such an implied right of action does exist, and, alternatively, that § 524 is enforceable via 11 U.S.C. § 105. The latter provision permits courts to "issue any order, process, or

how it could have violated § 524. See *Cox*, 242 B.R. at 449. The district court's dictum was, in our view, incorrect.

### D.   PREEMPTION OF STATE LAW CLAIMS

In *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559 (6th Cir. 1998), we described the three different types of preemption of state law by federal law under the Supremacy Clause, U.S. Const. art. VI: (1) express preemption, which occurs when Congress expresses an intent to preempt state law in the language of the statute; (2) field preemption, where Congress intends fully to occupy a field of regulation; and (3) conflict preemption, "where it is impossible to comply with both federal and state law, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 562-63.

Several factors highlight the exclusively federal nature of bankruptcy proceedings. The Constitution grants Congress the authority to establish "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, § 8. Congress has wielded this power by creating comprehensive regulations on the subject and by vesting exclusive jurisdiction over bankruptcy matters in the federal district courts. 28 U.S.C. § 1334(a). The pervasive nature of Congress' bankruptcy regulation can be seen just by glancing at the Code:

> "[A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike. [Footnote omitted.] While it is true that bankruptcy law makes reference to state law at many points, the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal. It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of

the cases relied upon by the Pertusos, this is not a case where the creditors were harassed with phone calls or barraged with correspondence; they received a single mailing, and that was it.

It would be fair to infer from the facts alleged in the complaint that Ford did not intend to file the reaffirmation agreement. But Ford's plans in this regard are irrelevant, given the facts that the Pertusos were represented by an attorney, that they had previously stated their intent to reaffirm the debt, that the reaffirmation agreement was reasonable on its face, and that Ford was not guilty of harrassment. See *Cox*, 242 B.R. at 449; *In re Wiley*, 224 B.R. 58, 66 (Bankr. N.D. Ill. 1998); *In re Holcomb*, 234 B.R. 79, 82 (Bankr. N.D. Ill. 1999). If the Pertusos were interested in knowing whether the agreement had been filed, it would have been simple enough for them or their attorney to find out. Viewed as a whole, the facts alleged in the amended complaint simply do not evince conduct that "is contrary to what a reasonable person would consider to be fair under the circumstances." *Briggs*, 143 B.R. at 453.

### 4. District Court's Finding of a § 524 Violation

The district court's opinion contains one somewhat curious wrinkle. Although rejecting the claim that § 524 provides a private right of action, the court acknowledged, by way of dictum, that the Pertusos' complaint sufficiently alleged a violation of that section. The Pertusos seize on this as support for their allegation of a right to relief under § 362.

Sections 524 and 362 apply to different time periods, of course. Section 362 applies during the automatic stay, whereas § 524(a)(2) applies post-discharge. See *In re Latanowich*, 207 B.R. 326, 336 n.15 (Bankr. D. Mass. 1997). Nevertheless, the Pertusos base their claims with respect to both sections on the same course of conduct – *i.e.*, the solicitation of the reaffirmation agreement and the acceptance of the Pertusos' monthly payments. If, as we have concluded, that course of conduct did not violate § 362, we do not see

judgment that is necessary or appropriate to carry out the provisions of this title."

In *Cort v. Ash*, 422 U.S. 66 (1975), the Supreme Court identified four factors that are to be considered in determining whether a private right of action exists for breach of a federal statute. The factors to be considered are these: (1) whether the plaintiff is a member of a class for whose special benefit the statute was enacted; (2) whether there is any explicit or implicit indication of congressional intent to create or deny a private remedy; (3) whether a private remedy would be consistent with the underlying purpose of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law. *Id.* at 78. "The most important inquiry," as the Court subsequently explained in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979), "is whether Congress intended to create the private remedy sought by the plaintiffs."

We are not to infer the existence of private rights of action haphazardly. Under *Touche Ross*, the recognition of a private right of action requires affirmative evidence of congressional intent in the language and purpose of the statute or in its legislative history. See *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 623 (6th Cir. 2000). With congressional intent as the touchstone, then, we turn to the language and purpose of § 524, its legislative history, and court decisions interpreting the section.

### 1. 11 U.S.C. § 524

Subsection 524(a)(2) provides that a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." The obvious purpose is to enjoin the proscribed conduct – and the traditional remedy for violation of an injunction lies in contempt proceedings, not in a lawsuit such as this one.

The other subsection on which the Pertusos rely, § 524(c), does not proscribe any conduct at all; it merely sets forth the conditions under which a reaffirmation agreement is enforceable. The consequence of not meeting the conditions is that the agreement is unenforceable. Accordingly, in our view, the language of § 524(c), like that of § 524(a)(2), does not suggest a legislative intent to provide a private right of action of the sort asserted by the Pertusos.

Turning to legislative history, the Pertusos claim support for their position on the basis of the following language in a House Report:

"[U]nsuspecting debtors are led into binding reaffirmations, and the beneficial effects of a bankruptcy discharge are undone. The advantages sophisticated and experienced creditors have over unsophisticated debtors in this area . . . still remain. The unequal bargaining position of debtors and creditors, and the creditors' superior experience in bankruptcy matters still lead to reaffirmations too frequently. To the extent that reaffirmations are enforceable, the fresh start goal of the bankruptcy laws is impaired." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 163 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6124.

Ignored by the Pertusos, however, is the fact that this language accompanied a version of H.R. 8200 that was not enacted into law. The House Report makes it clear that the bill under discussion would have prohibited reaffirmation agreements altogether: "The bill makes void any agreement that contains a reaffirmation of a discharged debt, and prohibits a creditor from entering into such an agreement." *Id.* at 6125. The bill that was enacted, on the other hand, allows for reaffirmation agreements within the limits prescribed by § 524(c). The history on which the Pertusos rely thus does little to advance their cause.

What Congress subsequently failed to do with regard to § 524 sheds rather more light on the legislature's intent. Congress amended the Bankruptcy Code in 1984 to provide

acceptance of payment when the request has been honored. The protections of § 524(c), the court's contempt power, and the debtor's privilege of rescinding the agreement all afford protection against exploitation, and we are aware of no caselaw squarely holding that voluntary payments may never be accepted during the stay.

2.    Mischaracterization of the Law

The Pertusos maintain that the reaffirmation letter was misleading because it represented that Ford could seize the van if the plaintiffs did not sign the agreement. The Pertusos acknowledge that a circuit split exists on this issue. Compare *In re Parker*, 139 F.3d 668, 672-73 (9th Cir.), *cert. denied*, 525 U.S. 1041 (1998) (holding that debtor can retain collateral without reaffirmation as long as required payments are continued) with *In re Burr*, 160 F.3d 843, 848-49 (1st Cir. 1998) (recognizing that creditor may seize collateral absent reaffirmation).

It is significant, we think, that the *Burr* decision comes from the very jurisdiction in which the Pertusos reside. There was no First Circuit caselaw contradicting Ford's representation at the time the representation was made, and the First Circuit's subsequent decision in *Burr* validated the position Ford took with the Pertusos. Ford had "a plausible legal theory establishing the existence of the asserted right," *Briggs*, 143 B.R. at 453, and the Pertusos' second argument fails for that reason.

3.    Intent Not to File Agreement

Stripped of its rhetoric, the Pertusos' complaint alleges that: (a) Ford solicited a reaffirmation agreement; (b) Ford did not file the signed agreement in court; (c) Ford has a practice of not filing such agreements; (d) Ford failed to inform the Pertusos that the agreement had not been filed; and (e) the Pertusos continued making their monthly payments pursuant to the agreement. Absent from the complaint is any allegation that Ford engaged in any contact with the Pertusos aside from the one-time solicitation of the agreement. Unlike some of

§ 362. We believe that *Briggs* serves as a useful guide here; a course of conduct violates § 362(a)(6) if it "(1) could reasonably be expected to have a significant impact on the debtor's determination as to whether to repay, and (2) is contrary to what a reasonable person would consider to be fair under the circumstances." *Briggs*, 143 B.R. at 453.

The Pertusos advance four arguments in support of their assertion that § 362 was violated here: (1) Ford required the plaintiffs to make their first payment under the reaffirmation agreement during the time when the automatic stay was in effect; (2) Ford led the plaintiffs to believe that it could seize the van notwithstanding that there is a circuit split on the existence of a right of seizure; (3) Ford intentionally failed to file the reaffirmation agreement and concealed the fact that the agreement had not been filed; and (4) the district court's observation that the plaintiffs would have stated a claim under § 524 if that section provided a private right of action supports the view that relief should be available under § 362. We shall examine each of these arguments in turn.

1.    Payment During the Automatic Stay

Characterizing Ford's communication as a threat to accelerate the indebtedness if the Pertusos failed to make timely payments, the Pertusos contend that their signature on the agreement obligated them to make payments during the automatic stay in contravention of § 362. Ford's response begins with the proposition that a secured creditor has a right to solicit a reaffirmation agreement. See *In re Duke*, 79 F.3d at 45. The Pertusos do not disagree. Rather, they draw a distinction between soliciting a reaffirmation agreement and collecting payments under it. We believe, however, that a secured creditor's acceptance of voluntary payments does not run afoul of the automatic stay as long as the payments have not been induced improperly. If "mere requests for payment are not barred absent coercion or harassment by the creditor," *Morgan Guar. Trust Co. v. American Sav. & Loan*, 804 F.2d 1487, 1491 & n.4 (9th Cir.1986), *cert. denied*, 482 U.S. 929 (1987), it is hard to see anything problematic in the

an express right of action under the automatic stay provision of 11 U.S.C. § 362(h). Pub. L. 98-353, § 304. It did so because reliance on the contempt power to remedy violations of § 362 had been widely criticized. See *Peterson v. Wells Fargo Bank*, __ F. Supp. 2d __, 2000 WL 1225788, at *5 n.1 (E.D. Cal. Aug. 17, 2000). Congress amended § 524 at the same time it amended § 362, but no private right of action was added in § 524. The contrast, we think, is instructive.

Lower courts addressing the question of whether there is an implied right of action under § 524 have reached conflicting results. The more persuasively reasoned opinions, in our judgment, are those holding that no such right of action exists. See, *e.g., Peterson*, 2000 WL 1225788; *Transamerica Fin. Servs. v. Danney*, 1999 WL 33117201 (D. Me. Dec. 23, 1999); *Cox v. Zale Delaware, Inc.*, 242 B.R. 444 (N.D. Ill. 1999); *Pereira v. First North American Nat'l Bank*, 223 B.R. 28 (N.D. Ga. 1998); *Costa v. Welch*, 172 B.R. 954 (Bankr. E.D.Cal. 1994); *Reyes v. FCC Nat'l Bank*, 238 B.R. 507 (Bankr. D.R.I. 1999); *In re Holcomb*, 234 B.R. 79 (Bankr. N.D. Ill. 1999).

Opinions recognizing a private right of action – see, *e.g.*, *Molloy v. Primus Automotive Fin. Servs.*, 247 B.R. 804 (C.D. Cal. 2000); *Malone v. Norwest Fin. Cal., Inc.*, 245 B.R. 389 (E.D. Cal. 2000); *Rogers v. NationsCredit Fin. Servs. Corp.*, 233 B.R. 98 (N.D. Cal. 1999) – have gone astray, it seems to us, by focusing on the *Cort* factors to the neglect of *Touche Ross* (see *Malone*, 245 B.R. at 396), and by ignoring or understating the importance of the 1984 amendments. (See *Rogers*, 233 B.R. at 109.)

In *Kelvin Publishing, Inc. v. Avon Printing Co., Inc.*, 1995 WL 734481 (6th Cir. 1995) (unpublished), we held that 11 U.S.C. § 363, which governs a debtor's use of cash collateral, does not provide a private right of action. In reaching this decision we were influenced by the fact that the 1984 amendments created a private right of action with respect to § 362(h) but failed to do so with respect to § 363, which was amended at the same time. As we have already suggested, the

events of 1984 are relevant to our present inquiry as well. Congress knew that courts were enforcing § 524 through contempt proceedings, and Congress knew how to create a private right of action when it wished to do so, but in this instance it elected to do nothing. As with § 363, we do not believe that the failure to provide for a private right of action in connection with § 524 was accidental.

Congress is currently considering bankruptcy reform, including a proposed amendment that would provide a private right of action under § 524. See H.R. 833, § 114, 106th Cong., 2d Sess. (2000). If Congress ultimately accepts policy arguments of the sort advanced by the Pertusos, and if the President signs the bill, there will in future be an express right of action with respect to § 524. Under the law as it now stands, however, we have no hesitancy in joining those courts (a clear majority) that have held § 524 does not impliedly create a private right of action.

### 2.   11 U.S.C. § 105

As to the argument that violations of § 524 may be remedied pursuant to § 105 (the section that authorizes courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"), we rejected a similar argument in *Kelvin*. In holding that § 105 could not be invoked to remedy breaches of § 363, we expressed ourselves as follows:

> "[W]e do not read § 105 as conferring on courts such broad remedial powers. The 'provisions of this title' simply denote a set of remedies fixed by Congress. A court cannot legislate to add to them." *Kelvin*, 1995 WL 734481, at *4.

This remains our view.[1]

---

[1] The Court of Appeals for the First Circuit recently concluded that § 524 may be enforced by a district court through § 105 without a contempt proceeding having been brought in the bankruptcy court.

### C.   CLAIMS UNDER § 362

Section 362(a) of the Bankruptcy Code creates an "automatic stay" which, among other things, precludes the creditor from seeking to obtain property of the estate or from assessing or collecting on a pre-petition claim against the debtor. 11 U.S.C. § 362(a)(3) and (6). The stay provision "gives the debtor a breathing spell" and "stops all collection efforts, all harassment, and all foreclosure actions." *Javens v. City of Hazel Park*, 107 F.3d 359, 363 (6th Cir. 1997) (quoting H.R. Rep. No. 95-595, at 340 (1978)). Debtors can remedy a "willful violation" of the automatic stay through § 362(h), which Congress added in 1984.

Courts considering § 362 claims have recognized that, taken to its logical extreme, this section could be read as prohibiting all contacts between creditors and debtors, including contacts regarding reaffirmation agreements. See *In re Duke*, 79 F.3d 43, 45 (7th Cir. 1996); *In re Briggs*, 143 B.R. 438, 450-51 (Bankr. E.D. Mich. 1992). Such a reading would obviously undermine § 524(c), which permits reaffirmation agreements. The Seventh Circuit has concluded that § 362 is not automatically violated by sending a reaffirmation letter to a debtor, see *Duke*, 79 F.3d at 45-46, and we agree with that conclusion. Something more than mere contact must be alleged in order to state a claim under

---

*Bessette v. Avco Fin. Servs., Inc.*, ___ F.3d ___, 2000 WL 1585090 (1st Cir. Oct. 27, 2000). Acknowledging that "§ 105 does not itself create a private right of action," the *Bessette* court went on to say that "a court may invoke § 105(a) 'if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code . . . .'" *Id.* at *3 (quoting *Noonan v. Secretary of HHS* (*In re Ludlow Hosp. Soc'y, Inc.*), 124 F.3d 22, 27 (1st Cir. 1997)).

To the extent that *Bessette* may be in tension with *Kelvin*, we adhere to the latter case. Section 105 undoubtedly vests bankruptcy courts with statutory contempt powers, but it "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law . . . ." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (citing *Southern Ry. Co. v. Johnson Bronze Co.*, 758 F.2d 137, 141 (3d Cir. 1985)).